**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **JOHN DOE**,  ) <br> ) <br> Plaintiff,  ) <br> ) <br> v.  ) <br> ) <br> **RICHARD SPENCER**, *in his official* ) <br> *capacity as Secretary of the Navy*,  ) <br> ) <br> Defendant.  ) <br> ) | Civil Action No. 19-cv-0691 (TSC) |

## <u>MEMORANDUM OPINION</u>

Plaintiff John Doe[1] brings this action against Defendant Richard V. Spencer, in his official capacity as Secretary of the Navy, seeking review of a May 11, 2017, Board for Correction of Naval Records decision denying Plaintiff's request that it remove information relating to a 2004 psychological evaluation from his military personnel file and reclassify the narrative reason for his discharge from the Marine Corps from "Secretarial Authority" to "Completion of Required Active Service." The parties have each moved for summary judgment. For reasons set forth below, the court will GRANT Defendant's motion for summary judgment and DENY Plaintiff's cross-motion for summary judgment.

### I.    BACKGROUND

Plaintiff served on active duty in the Marine Corps as a rifleman and Marine Corps Security Force guard from November 5, 2001, until his discharge on January 12, 2005. ECF No.

---

[1] At the outset of this case, Plaintiff filed a sealed motion to proceed under the pseudonym "John Doe." *See* ECF No. 3. Chief Judge Howell subsequently granted Plaintiff's motion. *See* ECF No. 7; *see also* Local Civil Rule 40.7(f) (the Chief Judge "shall . . . hear and determine . . . motions to file a pseudonymous complaint").

23, Joint Appendix ("JA") at 9, 184, 189-191.  On January 4, 2003, while stationed in Spain, Plaintiff was evaluated by a clinical psychologist, Dr. T.S. Herjmanowski, at the U.S. Naval Hospital in Rota during an emergency room consultation related to a suicide attempt.  *Id.* at 55-56, 75, 81-82, 103.  Dr. Herjmanowski initially diagnosed Plaintiff with Adjustment Disorder with Depressed Mood.  *Id.* at 56.  Following a subsequent evaluation on January 6, 2003, and two therapy sessions on January 6 and 24, 2003, Dr. Herjmanowski reported that Plaintiff's symptoms had resolved and that he was considered fit to return to full duty.  *Id.*

The next year, in June 2004, Plaintiff was experiencing depressive symptoms and referred himself to the Naval Medical Center in Portsmouth, Virginia for psychological evaluation.  *Id.* at 98-101.  Dr. Joseph Francis, a clinic psychologist, evaluated Plaintiff on June 23 and 25, 2004, and again in July 2004.  *Id.* at 99, 101.  Dr. Francis diagnosed Plaintiff with Major Depressive Disorder, Mild to Moderate, and Narcissistic, Antisocial and Paranoid Personality Traits.  *Id.* at 100.  In his report, Dr. Francis noted that Plaintiff's psychosocial history involved a chaotic upbringing, including early periods of separation from his parents, living with a drug addicted uncle, regular fighting, suspension from school, and estrangement from his peer group.  *Id.* at 99-100.  Dr. Francis also noted that Plaintiff "endorsed fantasies of harming anyone who might have hurt or offended him in the recent past."  *Id.* at 100.  He noted that while Plaintiff denied having "suicidal and homicidal ideation, [he] often ha[d] thoughts of assault with plan or intent."  *Id.*  Dr. Francis concluded that Plaintiff's "current fitness for full duty remains in question" and recommended additional treatment and evaluation of his fitness for duty.  *Id.* at 100.

During follow up care in August 2004, just one week before his unit was scheduled for training in California and then deployment to Afghanistan, Plaintiff revealed to Dr. Roxane

Thorstad at Makalapa Branch Medical Clinic in Pearl Harbor that he suffered "spikes of rage." *Id.* at 103, 106.  He reported that since joining the Marines, he "felt singled out and . . . targeted . . . and fantasize[d] about scenarios where he could fight back." *Id.* at 103.  He further reported feeling "that at some point in time, he [would] just snap," and would "destroy or be destroyed." *Id.*  Plaintiff stated that he had previously become suicidal "in a flash" and attempted to jump out of a window but was held back by other Marines. *Id.*  He had also contemplated hanging himself and relayed a history of homicidal and suicidal fantasies. *Id.*

Dr. Thorstad noted that Plaintiff's symptoms dated back at least to his high school years and, considering his "longstanding disorder of character and behavior," she diagnosed Plaintiff with Mood Disorder and Personality Disorder with antisocial, paranoid, and narcissistic traits. *Id.* at 103, 104.  Dr. Thorstad found that while Plaintiff was not imminently suicidal or homicidal, his reportedly impulsive actions and paranoia made his behavior impossible to predict. *Id.* at 103.  She reasoned that Plaintiff "represent[ed] a continuing risk of danger to self or others if retained," that Plaintiff "is at risk for harming himself or others if retained for any length of time," and concluded that Plaintiff "is deemed fit for return to duty for immediate processing for administrative separation, which should be initiated expeditiously by his command in compliance." *Id.* at 105.  On August 19, 2004, the battalion surgeon Dr. J. B. Hammel concurred with Dr. Thorstad's evaluation and recommendation for Plaintiff's separation. *Id.* at 110-111.

On October 7, 2004, Plaintiff's Commanding Officer issued a Notification of Separation Proceedings, informing Plaintiff of his recommendation that Plaintiff be discharged from the Marine Corps "by reason of convenience of the government due to a personality disorder" and that the "least favorable characterization of service which you may receive is a general (under

honorable conditions) discharge." *Id.* at 113.  The Commanding Officer further explained

Plaintiff's rights under the separation procedure, including his right to consult with counsel prior

to deciding whether to invoke or waive any rights, the right to submit written statements to the

Commanding General to rebut the separation recommendation and in lieu of a separation

hearing, and the right to obtain copies of documents forwarded to the Commanding General in

support of the proposed separation.  *Id.*  Plaintiff responded by requesting copies of any

documents that would be forwarded to the Commanding General but declined to invoke any

other rights outlined in the separation recommendation.  *Id.* at 158.

   The Commander of the Third Marine Division approved the Commanding Officer's

recommendation on October 8, 2004, finding that the separation recommendation was supported

by a preponderance of the evidence.  *Id.* at 116.  On January 3, 2005, the Staff Judge Advocate

for the Third Marine Division reviewed the proceedings, circumstances, and attached

documentation and found Plaintiff's separation was sufficient in law and fact.  *Id.* at 151.  The

Marine Corps then discharged Plaintiff on January 12, 2005, characterizing his discharge as

"General (Under Honorable Conditions)" with the narrative reason for separation of "Personality

Disorder."  *Id.* at 49.

   On October 20, 2005, Plaintiff petitioned the Naval Discharge Review Board ("NDRB")

to have his service characterization changed from "General (Under Honorable Conditions)" to

"Honorable."  *See id.* at 35.  The NDRB found that the discharge was proper but not equitable

because there was no evidence in his record of any significant negative conduct or performance,

and therefore granted his requested relief.  *Id.* at 42.

   In 2013 and 2014, Plaintiff sought independent medical review of his 2004 diagnosis.

First, in 2013, he requested that a clinical psychologist at the Northampton Veterans Affairs

Medical Center, Dr. Alan Bernhardt, "evaluate him to determine whether or not he is suffering

from a personality disorder." *Id.* at 118.  Dr. Bernhardt concluded that:

> It is very unlikely that the appropriate diagnosis for [Plaintiff] . . . was 'personality
> disorder' as that diagnosis requires a long history of maladaptive behavior, which
> was not the case. Furthermore, if the diagnosis were accurate then [Plaintiff] would
> have shown a continuing pattern of maladaptive behavior characteristic of persons
> with a personality disorder, which has not been the case based on [Plaintiff's]
> history which I obtained . . . The more accurate diagnosis at the time of his initial
> diagnosis would have been PTSD.

*Id.* at 118-19.

In April 2014, Plaintiff was referred to the Brenner Center for Psychological Testing and

Consultation in Massachusetts for additional review of his 2004 diagnosis.  An evaluating team

consisting of Dr. Caroline Miller, a licensed psychologist, and two pre-doctoral interns reasoned

that because Plaintiff did not currently present as having any symptoms of a personality disorder,

it is "highly unlikely that he had a personality disorder at any point following adolescence." *Id.*

at 121.  The evaluating team noted the "presence of potentially maladaptive personality traits,"

but found that these traits were "not clinically significant and should not be considered evidence

of a personality disorder," and that Plaintiff's "[h]istorical difficulties in social functioning . . .

appear to have been short-lived responses to distressing situations." *Id.*  However, the team also

found that Plaintiff "may exhibit Posttraumatic Stress Disorder," and that he exhibits "intrusive

thoughts of traumatic experiences," which may be "a result of early physical abuse and/or

serious physical injury incurred during military training." *Id.*

On March 13, 2015, Plaintiff petitioned the NDRB to change the narrative reason for his

separation discharge from "Personality Disorder" to "Completion of Required Active Service"

and to change his reentry code.  *See id.* at 29.  The NDRB granted Plaintiff partial relief by

changing his narrative reason for discharge to "Secretarial Authority" and his reentry code from

RE-4P to RE-1A.  *Id.* at 031.  The NDRB found that a "diagnosis of Personality Disorder require[d] that the patient manifests a longstanding disorder of character, behavior, and adaptability," but Plaintiff's record did not "substantiate any long-standing manifestations of these traits prior to the diagnosis, nor was there any evidence that he posed a threat to the safety or well-being of himself or others" and "[p]ost-service diagnosis . . . demonstrate[d] no Personality Disorder Traits."  *Id*.

On January 8, 2016, Plaintiff petitioned the Board for Correction of Naval Records ("the Board") to expunge his military record of all references to a personality disorder and all references that he posed a danger to himself and others, and to change the narrative reason for his separation from "Secretarial Authority" to "Completion of Required Active Service."  *Id.* at 15-25.  Plaintiff argued that (1) his discharge was based on a misdiagnosis of personality disorder, (2) he was denied his procedural rights, and (3) "Completion of Required Active Service" is the more equitable narrative reason for his discharge.  *Id.* at 2.  In support of his petition, he submitted 24 exhibits, including the NDRB decisions, his medical records, and letters from the clinicians who evaluated him in 2013 and 2014.  *Id.* at 26-147.

The Board denied Plaintiff's requested relief on May 11, 2017.  *Id.* at 1-14.  It found that Plaintiff's discharge was "not based solely on the personality disorder diagnosis," but on "the culmination of multiple psychological evaluations, the diagnoses from those evaluations, and subsequent recommendations of qualified medical officers and [Plaintiff's] chain of command." *Id.* at 2.  Moreover, the Board declined to remove or redact references to the personality disorder or Plaintiff posing a threat to himself and others because doing so would "create an unexplained void in his [Official Military Personnel File]."  *Id.*  The Board determined that the unredacted

documents, including the NDRB documents, were important for "explain[ing] the events and circumstances leading to [his] discharge" and the NDRB's later changes to his records.  *Id.*

The Board also found that Plaintiff was not deprived of any procedural rights. Specifically, it noted that "Marine Corps regulations state that 'before initiating separation, the command must have counseled the Marine' and the Marine must be given 'a reasonable opportunity to correct deficiencies . . .' [however, such] counseling is not required if a psychiatrist or psychologist determines that the Marine is an imminent or potential danger to himself or others."  *Id.*  The Board found that counseling was not necessary in Plaintiff's case for the following reasons:

- Plaintiff had been "evaluated by multiple qualified psychologists in Virginia and Hawaii, over a period of nearly two years, with each evaluation resulting in near-identical diagnoses of mood and character disorders. Two different psychologists stated in their evaluation that [Plaintiff] represent[ed] a continuing danger to [himself] and others if retained in the Marine Corps."  *Id.* at 2-3.

- Plaintiff's Commanding Officer felt Plaintiff "would continue to be a liability to the safety of the company" and that he "did not have confidence in [Plaintiff's] ability as a team lead."  *Id.* at 3.

- Plaintiff's "primary duties were that of a rifleman," but he had been prohibited from having access to weapons or deploying with his unit.  *Id.*

- Plaintiff's case had been reviewed by a Staff Judge Advocate, who found it to be sufficient in law and fact.  *Id.*

Regarding Plaintiff's request that the narrative reason for separation be changed, the Board found that Plaintiff's separation prior to the expiration of his term of service was in the

Marine Corps' best interest and that Plaintiff's requested narrative—"Completion of Required Active Service"—would be inaccurate.  *Id.*  Consequently, it concluded that there was no error or injustice reflected in Plaintiff's records and denied his request for relief.  *Id.*

Plaintiff now brings two causes of action against Defendant.  First, he alleges that the Navy maintains records containing material and harmful inaccuracies in violation of the Privacy Act.  Second, he claims that the Board's refusal to expunge his personnel file of all references to his 2004 diagnosis of personality disorder and to Plaintiff being a danger to himself or others, and its refusal to change the narrative reason for his separation to "Completion of Required Active Service," violated the APA because its decision was contrary to law, arbitrary and capricious, and unsupported by substantial evidence.  The parties have cross-moved for summary judgment.

## II.    LEGAL STANDARD

### A. <u>Motion for Summary Judgment</u>

Under Federal Rule of Civil Procedure 56, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  Moreover, summary judgment is properly granted against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  To determine which facts are "material," a court must look to the substantive law on which each claim rests.  *Anderson*, 477 U.S. at 248.  A

"genuine issue" is one whose resolution could establish an element of a claim or defense and

therefore affect the outcome of the action. *Celotex*, 477 U.S. at 322. In ruling on a motion for

summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor

and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.

**B. Judicial Review Under the APA**

On a motion for summary judgment in an APA case, the court must set aside any agency

action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2). The court's review is "highly deferential" and begins with a

presumption that the agency's actions are valid. *Envt'l. Def. Fund, Inc. v. Costle*, 657 F.2d 275,

283 (D.C. Cir. 1981). The court is "not empowered to substitute its judgment for that of the

agency," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), but instead

must consider only "whether the agency acted within the scope of its legal authority, whether the

agency has explained its decision, whether the facts on which the agency purports to have relied

have some basis in the record, and whether the agency considered the relevant factors,"

*Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014) (quoting *Fund for Animals v. Babbitt*,

903 F. Supp. 96, 105 (D.D.C. 1995)). The plaintiff bears the burden of establishing the

invalidity of the agency's action. *Envt'l. Def. Fund, Inc.*, 657 F.2d at 283 n.28.

While military correction board decisions are reviewable under the APA, "they are also

entitled to a great deal of deference." *Buckingham v. Mabus*, 772 F. Supp. 2d 295, 299 (D.D.C.

2011); *see also Cone v. Caldera*, 223 F.3d 789, 793 (D.C. Cir. 2000) (review is "unusually

deferential"); *Cargill v. Marsh*, 902 F.2d 1006, 1008 (D.C. Cir. 1990) ("heightened deference");

*Viles v. Ball*, 872 F.2d 491, 495 (D.C. Cir. 1989) (review is "exceptionally deferential"). "This

deferential standard is calculated to ensure that the courts do not become a forum for appeals by

every soldier dissatisfied with his or her rating, a result that would destabilize military command and take the judiciary far afield of its area of competence." *Cone*, 223 F.3d at 793.  The court need only determine "whether the Secretary's decision making process was deficient, not whether his decision was correct." *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1511 (D.C. Cir. 1989).  A plaintiff must overcome a strong presumption that the military administrators discharged their duties correctly, lawfully, and in good faith. *Frizelle v. Slater*, 111 F.3d 172, 177 (D.C. Cir. 1997).  To rebut this presumption, "the plaintiff has the burden of showing 'by cogent and clearly convincing evidence' that the decision was the result of a material legal error or injustice." *Doyle v. England*, 193 F. Supp. 2d 202, 207 (D.D.C. 2002).

### III.    ANALYSIS

#### A. <u>Privacy Act</u>

The Privacy Act provides that "[e]ach agency that maintains a system of records shall . . . maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5).  It permits an individual to "request amendment of a record pertaining to him" and requires the agency either to "make any correction" to the record or to "inform the individual of its refusal." *Id.* § 552a(d)(2).  If the agency refuses to amend the record, the Act authorizes the individual to bring an action in federal district court. *Id.* § 552a(g)(1).  The court's review under this provision is *de novo*. *Id.* § 552a(g)(2)(A); *see also Mueller v. Winter*, 485 F.3d 1191, 1196 (D.C. Cir. 2007).

"It is well-established that, generally speaking, the Privacy Act allows for correction of facts but not correction of opinions or judgments." *Mueller*, 485 F.3d 1197 (internal quotation

marks omitted); *see also Kleiman v. Dep't of Energy*, 956 F.2d 335, 337–38 (D.C. Cir. 1992)

("[T]he Privacy Act allows for amendment of factual or historical errors.  It is . . . not a vehicle

for amending the judgments of federal officials or . . . other[s] . . . as those judgments are

reflected in records maintained by federal agencies.") (internal quotation marks omitted).  "If a

subjective judgment is 'based on a demonstrably false' factual premise, however, the Privacy

Act compels the agency to correct or remove the judgment from the complaining individual's

record."  *Mueller*, 485 F.3d 1197 (quoting *White v. Office of Pers. Mgmt.*, 787 F.2d 660, 663

(D.C. Cir. 1986)).

　　　In *Mueller*, a Lieutenant Commander sued under the Privacy Act, challenging the Navy's

refusal to remove what he contended was an erroneous fitness report from his personnel record.

*Id.* at 1193.  The plaintiff argued that the fitness report "did not fairly reflect a substantially

accurate, complete and fair portrayal of [his] performance during the [covered] period."  *Id.* at

1194.  The D.C. Circuit held that the Board was not required to remove the fitness report from

his personnel file because it reflected the author's subjective judgment about the plaintiff's

performance.  *Mueller*, 485 F.3d 1197.  And although the report contained evaluation ratings that

were contradicted by ratings in a separate fitness report, the court held that the challenged ratings

"are still judgments—different judgments, but judgments nonetheless," such that the discrepancy

did not amount to a factual inaccuracy under the Act.  *Id.  See also Reinbold v. Evers*, 187 F.3d

348, 354 (4th Cir. 1999) (affirming dismissal of Privacy Act claim, reasoning that "if Dr.

Schmidt determined that [plaintiff] was paranoid and delusional, the Agencies did not err when

they recorded that he reached that conclusion, even if that opinion was in error").

　　　Plaintiff does not dispute that Dr. Thorstad diagnosed him as having a personality

disorder in 2004 and judged him to "represent a continuing risk of danger to self or others if

retained." JA at 105.  Nor does Plaintiff claim that Dr. Thorstad relied on any false factual premise to reach those conclusions.  Instead, he challenges the validity of Dr. Thorstad's medical opinion.  *See* Pl.'s Mot. at 15 (arguing that the "weight of the medical evidence unequivocally shows that Dr. Thorstad's diagnosis was incorrect."); *id.* at 16 (arguing that "Dr. Thorstad's speculation that [Plaintiff] posed a threat was inconsistent with other clinicians' findings").

To be sure, Dr. Thorstad's judgment has been contradicted by the medical professionals who evaluated Plaintiff in 2013 and 2014, but those diagnoses, like Dr. Thorstad's, represent "judgments—different judgments, but judgments nonetheless."  *Mueller*, 485 F.3d 1197.  Dr. Thorstad's conclusions "may be subject to debate, but they are not subject to alteration under the Privacy Act as long as the opinions are recorded accurately."  *Reinbold*, 187 F.3d at 354; *see also White*, 787 F.2d at 662 ("Where a subjective evaluation is based on a multitude of factors, . . . and there are various ways of characterizing some of the underlying events, . . . it is proper [for an agency] to retain and rely on it.").

Because Plaintiff has not demonstrated "a substantial controversy regarding factual assertions or historical fact statements," *Mueller*, 404 F. Supp. 2d at 54, Defendant is entitled to judgment as a matter of law that the agency has not violated the Privacy Act by refusing to amend Plaintiff's records.

**B.  <u>Administrative Procedure Act</u>**

Plaintiff contends that the Board's refusal to remove references to his 2004 diagnosis from his personnel file or change the narrative reason for his separation violated the APA. Specifically, Plaintiff argues that the Board used the wrong standard to determine whether his procedural rights were violated, failed to consider material facts and arguments, and made material findings of fact that were unsupported by substantial evidence.

Defendant argues that Plaintiff's alleged procedural deficiencies are meritless because the Marine Corps applied the correct legal standard when discharging Plaintiff, that any factual errors in the Board's decision were harmless, and that it was correct to deny Plaintiff's requested change in the narrative reason for his separation because Plaintiff's preferred narrative— "Completion of Required Active Service"—would be factually inaccurate.  Defendant argues that the Board's decision provides a rational connection between the facts and the choice made, and that its decision is entitled to substantial deference.  The court agrees.

 1. <u>Alleged Procedural Deficiencies</u>

The parties agree that the standard required for expedited discharge is that the servicemember be found to be an "immediate danger" to himself or others.  *See* Def.'s Mot. at 18; Pl.'s Mot. at 23.  The Board stated in its decision, however, that because Plaintiff was "found by qualified medical professionals to pose a *potential* danger to [himself] and others," expedited discharge was warranted without additional procedural safeguards or warning.  *See* JA at 3. Plaintiff argues that because the Board considered whether the Marine Corps found Plaintiff to be a "potential" danger to himself and others, it committed material legal error.

Though the Board did not describe the Marine Corps' separation decision as resting on a determination that Plaintiff posed an "immediate" danger to himself or others, the record nonetheless provides sufficient evidence to justify a finding that he did.  Specifically, the record reveals that Plaintiff self-reported "spikes of rage," *id.* at 103, 106, that he "fantasize[d] about scenarios where he could fight back," against others in the Marine Corps, *id.* at 103, and that he felt as though "at some point in time, he [would] just snap," and would "destroy or be destroyed," *id.*  Plaintiff also reported that he had previously become suicidal "in a flash," had attempted to jump out of a window but was held back by other Marines, had contemplated

hanging himself, and reported a history of homicidal and suicidal fantasies. *Id.* Dr. Thorstad found that Plaintiff's impulsive actions and paranoia made his behavior impossible to predict, *id.*, judged him to "represent a continuing risk of danger to self or others if retained" and that he was "at risk for harming himself or others if retained for any length of time," *id.* at 105. At the time, Plaintiff was also nearing his scheduled deployment to Afghanistan, and Dr. Thorstad opined that "[s]tressful situations, particularly close community quarters and combat, would likely exacerbate the patient's current symptoms and place him at higher risk for harm to self or others." *Id.*

This evidence provides a sufficient basis from which the Board could conclude that Plaintiff posed an "immediate" danger to himself or others, and thus its conclusion that the expedited "separation proceedings were not erroneous, unjust, or in violation of applicable regulation," *id.* at 3, was not deficient. There is a "presumption that military administrators discharge their duties correctly, lawfully, and in good faith," *Mueller v. England*, 404 F. Supp. 2d 51, 55 (D.D.C. 2005), and the Board's failure to use the words "immediate danger," while also relying on evidence capable of showing that Plaintiff presented an "immediate danger," does not overcome that presumption.

2.  The Board's Consideration of Evidence and Factual Findings

Plaintiff argues that the Board erred by not considering the 2013 and 2014 medical reports or the NDRB's 2015 decision, by wrongly stating that his separation from the Marine Corps "was not solely based on the personality disorder diagnosis," by treating him differently than others who requested similar relief from the Board, and by stating that "two different psychologists" diagnosed him with a personality disorder. *See* Pl.'s Mot. at 25-35. The court disagrees.

First, Plaintiff's argument that the Board did not consider the 2013 and 2014 medical reports, or the NDRB's 2015 decision, is belied by the record. The Board's decision specifically states that it considered Plaintiff's "application, together with all material submitted in support thereof," his "entire record and application with attachments," his argument that his "discharge was based on a misdiagnosis of personality disorder," and it makes explicit note of the NDRB decision. *See* JA at 2.

Second, contrary to Plaintiff's argument, the Board's finding that Plaintiff's discharge "was not solely based on the personality disorder diagnosis," is supported by evidence. Specifically, the record shows that the Marine Corps' decision was based on Plaintiff's "diagnosis of having a mood disorder not otherwise specified (NOS), personality disorder NOS with antisocial, paranoid, and narcissistic traits," *id.* at 113, causing conditions that rendered him unfit to handle "any type of weapon," *id.* 111.

Third, Plaintiff argues that the Board treated him differently than "similarly situated applicants." Pl.'s Mot. at 32. He cites an example of the Board removing an adverse fitness report from a Marine's personnel file that was erroneously attributed to that Marine. *Id.* (citing Board Decision Docket No. 06714-06). But unlike the adverse fitness report in that case, records pertaining to Plaintiff's 2004 diagnosis were correctly attributed to him and therefore Plaintiff's reliance on Board Decision No. 06714-06 is unavailing.

Finally, Plaintiff argues that the Board's decision was unlawful because it rested on the inaccurate factual statements that "two different psychologists" diagnosed him with a personality disorder and found that he was a continuing danger to himself or others. Pl.'s Mot. at 34-35. Defendant concedes that Dr. Thorstad was the only psychologist to diagnose Plaintiff as having a personality disorder and contends it was a "typographical error" for the Board to refer to Dr.

Hammel, the battalion surgeon, as the second psychologist.  Def.'s Mot. at 15.  But the Board's "typographical error" does not amount to a "showing 'by cogent and clearly convincing evidence' that the decision was the result of a material legal error or injustice."  *Doyle*, 193 F. Supp. 2d at 207.  Indeed, the Marine Corps and the Board are not required to base their decisions on the opinions of multiple doctors, *see* AR 258-59, and although Dr. Hammel was not a psychologist, he was a medical professional, and it does not appear that the Board's decision turned on the existence of a second psychologist's evaluation.

Plaintiff disagrees with the Board's weighing of the evidence and, in essence, calls on the court to substitute its own judgment for the Board's.  But it is not this court's role to question whether the Board's decision was correct.  *Kreis*, 866 F.2d 1511.  Instead, it considers only whether the Board's "decision making process was deficient," *id.* and here, it finds that it was not.

## IV.    CONCLUSION

For the reasons explained above, the court will GRANT Defendant's motion for summary judgment and DENY Plaintiff's cross-motion for summary judgment.

Date:  March 31, 2022

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge